## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH F. HOLLAND, *et al.*,

        *Plaintiffs*,

    v.

PAMELA JO BONDI, *et al.*,

        *Defendants*.

Civil Action No. 24 - 2687 (LLA)

## <u>MEMORANDUM OPINION</u>

Plaintiffs, who are both victims of the September 11 terrorist attacks and the personal representatives of individuals killed as a result of the attacks, bring this action against Attorney General Pamela Jo Bondi, Secretary of the Treasury Scott Bessent, Special Master of the U.S. Victims of State Sponsored Terrorism Fund Mary Patrice Brown, the U.S. Department of Justice, the U.S. Department of the Treasury, and the Office of Management and Budget (collectively, "Defendants"). ECF No. 1.[1] Plaintiffs allege that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by erroneously administering the U.S. Victims of State Sponsored Terrorism Fund. Defendants move to dismiss for lack of subject-matter jurisdiction. ECF No. 18. For the reasons explained below, the court will grant Defendants' motion and dismiss the complaint.

---

[1] While Plaintiffs originally sued former Attorney General Merrick Garland and former Secretary of the Treasury Janet Yellen, Attorney General Bondi and Secretary Bessent are "automatically substituted" as their successors pursuant to Federal Rule of Civil Procedure 25(d).

# I.    STATUTORY BACKGROUND

## A.    The September 11th Victim Compensation Fund

Following the September 11, 2001 terrorist attacks, Congress enacted several laws to compensate victims and their loved ones.  In 2001, it created the September 11th Victim Compensation Fund ("VCF"), to be administered by a Special Master for the express purpose of "provid[ing] compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001."  Pub. L. No. 107-42, § 403, 115 Stat. 230, 237 (2001).  Persons injured during the September 11 attacks—or their personal representatives if they were deceased—could file a claim with the Special Master.  *Id.* § 405, 115 Stat. at 238-40.  Upon determining a claimant to be eligible, the Special Master would distribute VCF funds to the claimant.  *Id.* § 406, 115 Stat. at 240.

The original VCF closed in June 2004.  *See* September 11th Victim Compensation Fund, *Section 1: Eligibility Criteria and Deadlines* (Aug. 5, 2025), https://perma.cc/CNW8-GQXY; *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022) ("The Court may take judicial notice of information posted on official public websites of government agencies.").  In 2011, Congress reopened the VCF for a period of five years, appropriated $2.775 billion to the Fund, and expanded the pool of eligible claimants.  *See* James Zadroga 9/11 Health and Compensation Act of 2010, Pub. L. No. 111-347, 124 Stat. 3623, 3660-64 (2011).  In 2015, Congress extended the VCF for another five years, *see* James Zadroga 9/11 Victim Compensation Fund Reauthorization Act, Pub. L. No. 114-113, 129 Stat. 2242, 3000 (2015), and in 2019, Congress extended the Fund through fiscal year 2092, *see* Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez

Permanent Authorization of the September 11th Victim Compensation Fund Act, Pub. L. No. 116-34, 133 Stat. 1040, 1040 (2019).[2]

### B.    The U.S. Victims of State Sponsored Terrorism Fund

As a general matter, individuals can sue a foreign state sponsor of terrorism for injury or death caused by certain acts of terror. *See* 28 U.S.C. § 1605A(a) (waiving foreign sovereign immunity for state sponsors of terrorism if certain conditions are met). But because collecting damages from state sponsors of terrorism is far more difficult than winning judgments against them, Congress created the U.S. Victims of State Sponsored Terrorism Fund ("USVSSTF") in 2015 to help plaintiffs secure compensation. *See* Justice for United States Victims of Sponsored Terrorism Act, Pub. L. No. 114-113, § 404, 129 Stat. 2242, 3007 (2015) (codified at 34 U.S.C. § 20144). Congress appropriated $1.025 billion to start the Fund, 34 U.S.C. § 20144(e)(5), and provided that "future funding [would] come from certain forfeiture proceeds, penalties, and fines from federal civil and criminal matters involving state sponsors of terrorism," *O'Neill v. Garland*, No. 21-CV-1288, 2022 WL 17415057, at *1 (D.D.C. Dec. 5, 2022); *see* 34 U.S.C. § 20144(e)(2).

Like the VCF, the USVSSTF is administered by a Special Master. 34 U.S.C. § 20144(b)(1)(A). The Special Master is appointed by the Attorney General and tasked with "specifying the procedures necessary for United States persons to apply and establish eligibility for payment." *Id.* § 20144(b)(2)(A). To be eligible for moneys from the Fund, the claimant must (1) be "a United States person," (2) hold a valid, federal-court judgment against a state sponsor of terrorism, and (3) comply with the statute's relevant deadlines, although the Special Master may

---

[2] Because the distinction between the first and second iterations of the Fund are not legally significant in this case, the court will refer to the entire program as the "VCF."

"grant a claimant a reasonable extension" of any application-related deadlines.  *Id.* § 20144(c) & (c)(3)(B).  Claimants must also "provide the Special Master with information regarding compensation from any source other than [the USVSSTF]" resulting from an act of terrorism, such as the VCF.  *Id.* § 20144(b)(2)(B).

If the Special Master determines that a claimant is eligible, she "shall order payment" from the USVSSTF to the claimant or the claimant's estate.  *Id.* § 20144(d)(1).  After accounting for statutorily prescribed caps on recovery and the allocation of monies in the Fund, payments are made "on a pro rata basis, based on the amounts outstanding and unpaid on eligible claims."  *Id.* § 20144(d)(3)(A)(i).  With regard to timing, the payments are distributed in rounds, with the first having taken place in December 2016 and the most recent in December 2024.[3]  Importantly, "[a]ll decisions made by the Special Master with regard to compensation from the [USVSSTF] [are] not subject to . . . judicial review."  *Id.* § 20144(b)(3).  Instead, "a claimant whose claim is denied in whole or in part . . . may request a hearing before the Special Master."  *Id.* § 20144(b)(4)(A).  The

---

[3] To date, there have been five rounds of distributions as follows:

- December 2016, roughly $1.1 billion to 2,332 claimants, *see* USVSSTF, *Supplemental Report from the Special Master* 4-5 (Aug. 2017), https://perma.cc/GU7U-GY26;

- December 2018, roughly $1.1 billion to 3,172 claimants, *see* USVSSTF, *Report Regarding Second Distribution* 2 (Feb. 2019), https://perma.cc/8YJP-NCCV;

- May 2020, roughly $1.1 billion to 7,479 claimants, *see* USVSSTF, *Report Regarding Third Distribution* 3, (June 2020), https://perma.cc/3SUG-8WDK;

- December 2022, roughly $100 million to 2,130 claimants, *see* USVSSTF, *Report Regarding Fourth Distribution* 3 (Jan. 2023), https://perma.cc/YCR3-WJE3;

- December 2024, roughly $1 billion to 4,542 claimants, *see* USVSSTF, *Report Regarding Fifth Distribution* 4 (Jan. 2025), https://perma.cc/8CWF-KYFC.

In total, more than $7 billion has been awarded to nearly 19,000 claimants from the USVSSTF. *See Report Regarding Fifth Distribution*, at 15.  The Fund is scheduled to make its final distribution by January 2, 2039.  34 U.S.C. § 20144(e)(6).

Special Master shall thereafter "issue a final written decision affirming or amending the original decision," which is "nonreviewable." *Id.*

While any eligible individual with a federal-court judgment against a state sponsor of terrorism may submit a claim to the USVSSTF, the statute creating the Fund contains specific provisions for victims of certain terrorist attacks, including the 1983 Beirut barracks bombing, the 1996 Khobar Towers bombing, and the September 11 attacks. As it concerns the September 11 attacks, the statute divides claimants into three legally significant categories. First, a "9/11 victim" is an eligible claimant who was injured or killed as a result of the September 11 attacks (or the personal representative of such a claimant if the claimant is deceased). *Id.* § 20144(j)(14); Pub. L. No. 107-42, § 405(c)(2), 115 Stat. at 239-40. Second, a "9/11 spouse" or "9/11 dependent" is an eligible claimant who is the spouse or dependent of a 9/11 victim. 34 U.S.C. § 20144(j)(11), (13); Pub. L. No. 107-42, § 405(c)(2), 115 Stat. at 239-40. Third, a "9/11 family member" is any immediate family member of a 9/11 victim who is not a 9/11 spouse or 9/11 dependent. 34 U.S.C. § 20144(j)(12); Pub. L. No. 107-42, § 405(c)(2), 115 Stat. at 239-40. Regardless of status, no claimant may receive more than $20 million, *id.* § 20144(d)(3)(A)(ii)(I), and 9/11 victims, spouses, and dependents from the same family may not cumulatively receive more than $35 million, *id.* § 20144(d)(3)(A)(ii)(III). Additionally, since 2019, related 9/11 family members who are *not* 9/11 victims, spouses, or dependents may not cumulatively receive more than $20 million. *Id.* § 20144(d)(3)(A)(ii)(IV).

At the USVSSTF's inception, otherwise-eligible 9/11-related claimants who had already received an award or award determination from the VCF could not receive additional compensation from the USVSSTF. *See* Pub. L. No. 114-113, § 404(d)(3)(ii)(III), 129 Stat. at 3010 (stating that "the amount of compensation to which [a 9/11-related claimant] was determined to

be entitled under [the VCF] *shall be considered controlling* for the purposes of [the USVSSTF]"
(emphasis added)).  In practice, this meant that many 9/11 victims, spouses, and dependents were
precluded from receiving USVSSTF funds because they had already received an award through
the VCF.  *See* U.S. Gov't Accountability Off., *USVSSTF: Estimated Lump Sum Catch-Up
Payments* 5 (Aug. 11, 2021), https://perma.cc/6X23-22C5 ("Comptroller General's Report").
Conversely, 9/11 family members (i.e., immediate family members *other than* spouses and
dependents of 9/11 victims) generally *were* able to draw from the USVSSTF because they were
less likely to have been eligible for payments from the VCF.  *Id.*

In 2019, Congress removed the limitation on VCF awardees' participation in the
USVSSTF, "opening the door for otherwise eligible claimants who had participated in the . . . VCF
to bring claims to the [USVSSTF]."  *O'Neill*, 2022 WL 17415057, at *2; United States Victims of
State Sponsored Terrorism Fund Clarification Act ("Clarification Act"), Pub. L. No. 116-69,
§ 1701, 133 Stat. 1134, 1140 (2019).  Congress gave these claimants until February 19, 2020 to
submit applications and directed the Special Master to issue awards by May 19, 2020 (with actual
payment to occur in the next distribution round).  *See* Pub. L. No. 116-69, § 1701(b)(1)(B)(ii), 133
Stat. at 1140 (providing that individuals newly eligible to file claims with the USVSSTF "shall
have 90 days from the [November 21, 2019] date of enactment of [the Clarification] Act to submit
an application for payment"); *id.* at 1142(providing that the Special Master "shall authorize third-
round payments [between] 90 days[] and . . . 180 days[] after the date of enactment of
the . . . Clarification Act").  Congress also specified that, for all future distributions, funds had to
be evenly split between 9/11-related claimants and non-9/11-related claimants, i.e., victims of
other acts of terrorism.  *Id.* § 1701(b)(1)(C), 133 Stat. at 1141.

In December 2020, Congress amended the statute again by authorizing lump sum "catch-up" payments for 9/11-victims, spouses, and dependents. Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, § 1705(b), 134 Stat. 1182, 3293-94 (2020). These payments were designed to ensure that the 9/11 victims, spouses, and dependents who had previously been excluded from participating in the USVSSTF because of their participation in the VCF would receive an equal share of payments as 9/11 family members who had not participated in the VCF. *Id.* Congress directed the Comptroller General to determine the amount of these "catch-up" payment for each 9/11 victim, spouse, and dependent who had submitted an application. *Id.* § 1705(b)(2), 134 Stat. at 3293-94. In December 2022, after the Comptroller General had completed its report, Congress appropriated $3 billion for "catch-up" payments and directed the Special Master to "authorize lump sum catch-up payments in amounts equal to the amounts described in the [report]." *Id.*; *see* Comptroller General's Report, at 1; Fairness for 9/11 Families Act, Pub. L. No. 117-328, § 101(b)(3)(B), 136 Stat. 4459, 6106-09 (2022).

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following factual allegations drawn from the complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion before the court, *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Co.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). Plaintiffs filed this action in September 2024, alleging that Defendants' interpretation and administration of the USVSSTF were arbitrary and capricious and contrary to law under the APA. ECF No. 1. Plaintiffs are divided into four groups of 9/11-related claimants: the Net-Zero Plaintiffs (Count 1); the Supplemental-Value Plaintiffs (Count 2); the Nunc-Pro-Tunc Plaintiffs (Count 3); and the Dual-Judgment Plaintiffs (Count 4). *Id.* ¶¶ 1, 24. All four groups had won default judgments against the Islamic Republic of Iran for its role in providing support to Al Qaeda in carrying out the September 11 attacks. *Id.* ¶¶ 2-3; *see*

Amended Complaint, *Burnett v. Islamic Republic of Iran*, No. 15-CV-9903 (S.D.N.Y. Feb. 8, 2016), ECF No. 53. And all members of each group subsequently submitted claims to the USVSSTF. ECF No. 1 ¶¶ 25, 64, 76, 122.

### A.    Net-Zero Plaintiffs

The Net-Zero Plaintiffs are, or represent the decedents' estates of, victims of the September 11 attacks who also lost loved ones during the attacks. *Id.* ¶ 25. Each Net-Zero Plaintiff received an award or award determination from the VCF for his own injuries before the passage of the Clarification Act, and each holds a judgment against the Islamic Republic of Iran for the loss of a loved one. *Id.* Because, before the Clarification Act, the Special Master had interpreted the USVSSTF Act to preclude any claim by a claimant who had received funds from the VCF, the Special Master deemed the Net-Zero Plaintiffs' VCF awards for their own injuries to be "controlling" as to both their claims as 9/11 victims and as 9/11 family members, and they received "net zero" awards from the USVSSTF. *Id.* ¶¶ 25, 142. After the Clarification Act removed the VCF-related bar, the Net-Zero Plaintiffs renewed their applications, but they "were erroneously categorized as 9/11 family members" instead of as "9/11 victims." *Id.* ¶ 25.[4]

The Net-Zero Plaintiffs argue that they are "unequivocal[ly]" 9/11 victims under the language of the Clarification Act. *Id.* ¶ 169. They allege that Defendants' failure to classify them as such "deprived the[m] of substantial compensation in the form of the lump sum catch-up payments [valued at] 5.8573% of each claimant's net eligible claim amount." *Id.* ¶ 171. The

---

[4] Some of the Net-Zero Plaintiffs did not file USVSSTF claims until after the Clarification Act because they knew that they would not receive an award under the original version of the USVSSTF. ECF No. 1 ¶ 26. These plaintiffs are "still considered Net-Zero Plaintiffs because their ability to collect payment from the [USVSSTF] did not begin until the [VCF] bar . . . was removed . . . by virtue of enactment of the Clarification Act." *Id.*

Net-Zero Plaintiffs additionally contend that, as a result of their erroneous categorization as 9/11 family members, their aggregate awards were limited to $20 million instead of $35 million. *Id.* ¶ 172. They maintain that, "[h]ad Defendants appropriately categorized the[m] as '9/11 victims[,]' . . . [they] would each have received a lump sum catch up payment in April or May 2023 without a pro-rata reduction of their claim amount based on 9/11 family member aggregate claim caps." *Id.* ¶ 173. The Net-Zero Plaintiffs seek an order compelling Defendants to classify them as "9/11 victims" under 34 U.S.C. § 20144(j)(14). ECF No. 1 ¶¶ 236-40.

### B.    Supplemental-Value Plaintiffs

The Supplemental-Value Plaintiffs are personal representatives of the decedent estates of individuals killed as a result of the September 11 attacks. ECF No. 1 ¶ 64. Each had received a judgment against the Islamic Republic of Iran and filed a claim with the USVSSTF before the Clarification Act's February 19, 2020 deadline. *Id.* After the deadline passed, each Supplemental-Value Plaintiff obtained a supplemental judgment against the Islamic Republic of Iran for economic-loss damages on behalf of the decedent's estate. *Id.* They provided the supplemental judgments to the USVSSTF and obtained a revised Notice-of-Claim amount incorporating the supplemental judgments before Congress appropriated funds for catch-up payments in December 2022 based on the Comptroller General's report. *Id.* While the Supplemental-Value Plaintiffs received catch-up payments based on their original pain-and-suffering damages figures, they did not receive catch-up payments for their supplemental economic-loss damages. *Id.* ¶¶ 64-65.

The Special Master justified this decision by explaining that, when the Comptroller General calculated the catch-up payments, he "used data from [the] third round [of distributions]," and "judgments or additional compensatory damages amounts added after the [USVSSTF]'s third

round therefore could not have been included in [his] calculation." *Id.* ¶ 186. The Supplemental-Value Plaintiffs allege that "this rationale for refusing to recognize the current claim values . . . was unjustified" and "deprived the[m] of substantial compensation in the form of the lump sum catch-up payments on their current claim values at the Comptroller General's recommended 5.8573% of each claimant's net eligible claim amount." *Id.* ¶¶ 190, 192. They seek an order compelling Defendants to credit their supplemental awards and recalculate their catch-up payments. *Id.* ¶¶ 241-44.

### C.    Nunc-Pro-Tunc Plaintiffs

The Nunc-Pro-Tunc Plaintiffs, most of whom had received VCF awards, filed motions for default judgment against the Islamic Republic of Iran before the Clarification Act's February 19, 2020 deadline. ECF No. 1 ¶¶ 76, 196. Because they only had ninety days from the passage of the Clarification Act until the February 19, 2020 deadline, they "worked diligently [in] seeking final judgments" as quickly as possible and submitted claims to the USVSSTF before the deadline in anticipation of securing those judgments. *Id.* ¶ 196. The Nunc-Pro-Tunc Plaintiffs also sought extensions of time to submit their applications to the USVSSTF, but the Special Master denied their requests. *Id.* ¶ 199. In the first week of March 2020, the U.S. District Court for the Southern District of New York granted their motions for default judgment. *Id.* ¶ 198. Then, in May 2020, the district court granted the Nunc-Pro-Tunc Plaintiffs' request to backdate the judgments to an effective date of February 19, 2020. *Id.* ¶ 200. Despite this, the Nunc-Pro-Tunc Plaintiffs were denied participation in both the third-round distribution and lump sum catch-up payments. *Id.* ¶ 203.

The Nunc-Pro-Tunc Plaintiffs argue that the Special Master's decision to "disregard[]" a "determination by an Article III judge . . . [was] arbitrary and capricious . . . and contrary to the

law." *Id.* ¶ 205.  They claim that the Special Master is obligated "to accept applications from claimants who submit applications before February 19, 2020 who meet the requirements [of the USVSSTF Act]" and that their applications were compliant.  *Id.* ¶¶ 206-07.  Due to the Special Master's decision, the Nunc-Pro-Tunc Plaintiffs' claims were "held over until the fourth round of payments and [they were] deprived of payments in the third round that provided compensation of 0.7567585% of each eligible claimant's net eligible claim value."  *Id.* ¶ 208.

Additionally, because the lump sum catch-up payments authorized in December 2020 were based on submitted third-round applications, "the USVSST[F] . . . did not provide [the Nunc-Pro-Tunc Plaintiffs'] claim information to the Comptroller General to allow them to be considered for the lump sum catch-up payments."  *Id.* ¶ 211.  "The majority of the Nunc Pro Tunc Plaintiffs would have [otherwise] qualified for lump sum catch-up payments."  *Id.* ¶ 210.  As a result, they also lost out on additional catch-up payments "of 6.6140585% of their net eligible claim amounts."  *Id.* ¶ 213.  The Nunc-Pro-Tunc Plaintiffs seek an order requiring Defendants to recognize their applications as timely for purposes of third-round distributions and catch-up payments.  *Id.* ¶¶ 245-49.

### D.    Dual-Judgment Plaintiffs

Each Dual-Judgment Plaintiff is a surviving family member of two loved ones killed in the September 11 attacks.  ECF No. 1 ¶ 122.  Before the passage of the Clarification Act, the Dual-Judgment Plaintiffs each won a default judgment and submitted a USVSSTF claim for one deceased family member.  *Id.*  After the passage of the Clarification Act, the Dual-Judgment Plaintiffs each obtained a subsequent default judgment and submitted it to the USVSSTF before the February 19, 2020 deadline, but they failed to amend their original applications to reflect the additional judgment value until June 2020.  *Id.* ¶¶ 122, 228.  While the Dual-Judgment Plaintiffs

received awards based on their original damages figures, they did not receive third-round or catch-up payments for their subsequent judgments.  *Id.*

The Special Master justified this decision on the ground that "[t]he compensatory damages awarded to the claimants in these new judgments [we]re based on different victim(s) and relationship(s) than the judgments originally provided with the claimants' applications."  *Id.* ¶ 225 (first alteration in original).  The Dual-Judgment Plaintiffs argue that the Special Master should have given them an opportunity to amend and correct their original applications, rather than exclude them from the third round of distributions.  *Id.* ¶¶ 226-27, 229.  As with the other groups of Plaintiffs, the Dual-Judgment Plaintiffs also assert that the erroneous handling of their second-judgment values deprived them of catch-up payments to which they were entitled.  *Id.* ¶¶ 231-32. They seek an order compelling Defendants to recognize their second judgments as timely for purposes of third-round distributions and catch-up payments.  *Id.* ¶¶ 250-53.  Each of the three Dual-Judgment Plaintiffs also seeks re-classification: Plaintiff Victor Colaio as a "9/11 victim"; Plaintiff Lisa Ventura as a "9/11 spouse"; and Plaintiff Elaine Abate as a "9/11 dependent."  *Id.* ¶ 253.

\*     \*     \*

In addition to their group-specific requests, *see supra* Parts II.A, II.B, II.C, and II.D, all Plaintiffs seek a declaration that Defendants' actions violated the USVSSTF Act.  *See id.* ¶¶ 240, 244, 249, 253.

In January 2025, Defendants filed a motion to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction.  ECF No. 18.  The motion is now ripe for disposition.  ECF Nos. 18, 23, 26.

### III.    LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause lies outside [of] this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177-78 (D.D.C. 2007). In reviewing such a motion, the court "is not limited to the allegations set forth in the complaint" and "'may consider materials outside the pleadings.'" *Morrow v. United States*, 723 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms. Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). Additionally, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co.*, 642 F.3d at 1139 (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### IV.    DISCUSSION

No matter how persuasive or compelling Plaintiffs' merits arguments may be, the court cannot reach them if it lacks jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 431 (2007) ("'Without jurisdiction[,] the court cannot proceed at all in any cause'; it may not assume jurisdiction for the purpose of deciding the merits of the case." (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998))). Defendants argue that the USVSSTF Act deprives the court of subject-matter jurisdiction over Plaintiffs' claims. Plaintiffs, meanwhile, characterize their suit as challenging a distinct threshold issue that lies outside the scope of the

statute's jurisdiction-stripping provision.  Ultimately, the court concludes that Defendants have the better of the argument.[5]

Because "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," there is generally a "'strong presumption' favoring judicial review of administrative action."  *Mach Mining, LLC v. Equal Emp't Opportunity Comm'n*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).  This presumption applies even when a court is "determining the scope of statutory provisions specifically designed to limit judicial review."  *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020).  A federal agency thus "bears a 'heavy burden' in attempting to show that Congress 'prohibit[ed] all judicial review' of the agency's" actions.  *Mach Mining, LLC*, 575 U.S. at 486 (alteration in original) (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)).

While this presumption is a formidable one, it is "rebuttable by a clear statement of congressional intent to preclude review."  *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017).  Such intent can be divined "not only from [the statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).

---

[5] Defendants also argue that the Department of the Treasury, Secretary Bessent, and the Office of Management and Budget should be dismissed from the case because they did not play any role in the complained-of actions giving rise to this suit.  ECF No. 18-1, at 14-16.  Plaintiffs agree.  *See* ECF No. 23, at 32-33 (agreeing with Defendants that "the crucial decision makers in the decisions at issue in this case are Mary Patrice Brown, the current Special Master of the [US]VSST[F]; Attorney General Pamela Bondi . . . ; and the United States Department of Justice" and stating that "the Court may simply dismiss Plaintiffs' claims as against th[e]se Defendants by order based on this filing").  This provides an independent basis for the court to dismiss the Department of the Treasury, Secretary Bessent, and the Office of Management and Budget.

14

When Congress precludes judicial review, a court lacks subject-matter jurisdiction to entertain the claim. *See Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1071 (D.C. Cir. 2018).

## A.    Plain Language

The parties agree that the court's jurisdiction in this case depends on 34 U.S.C. § 20144(b)(3), which provides that "[a]ll decisions made by the Special Master with regard to compensation from the [USVSSTF] shall be . . . final and . . . not subject to administrative or judicial review."[6]  Their dispute centers on whether the phrase "decisions . . . with regard to compensation" encompasses the decisions Plaintiffs challenge here.  While Plaintiffs encourage the court to read Section 20144(b)(3) narrowly, the provision's plain text evinces a clear legislative intent to preclude judicial review of the claims at issue in this case.

Not long ago, another judge of this court (Boasberg, C.J.) interpreted the same jurisdiction-stripping provision of the USVSSTF Act and reached the same conclusion.  In *O'Neill v. Garland*, No. 21-CV-1288, 2022 WL 17415057 (D.D.C. Dec. 5, 2022), a class of 9/11-related claimants who became eligible to draw from the USVSSTF due to the Clarification Act sued under the APA "to challenge the method for calculating payments devised by the Special Master."  *Id.* at *1. Specifically, they alleged "that the Special Master [had] violated the [USVSSTF] Act by establishing a payment methodology . . . that improperly result[ed] in underpayments to 9/11-related claimants newly eligible to draw from the Fund."  *Id.* at *2.  The plaintiffs asked the court to "mandate a different formula for future distributions, which would include reimbursing them for the prior errors."  *Id.*  In response, the government argued that Section 20144(b)(3)

---

[6] As noted *supra*, the statute provides a narrow avenue for requesting a hearing for the Special Master to reconsider her decision, 34 U.S.C. § 20144(b)(4)(A)-(B), but that is not relevant to the court's analysis of its jurisdiction.

"expressly precluded judicial review of 'all decisions made by the Special Master with regard to compensation from the Fund,'" including the methodology challenged by the plaintiffs. *O'Neill*, 2022 WL 17415057, at *2 (quoted source omitted).

The *O'Neill* court concluded that "its inquiry beg[a]n[] and end[ed] with the question of its jurisdiction." *Id.* at *3. "[U]nder the plain text of the statute, the explanation of payments [was] a 'decision' that the Special Master made 'with regard to compensation.'" *Id.* at *4. The statute's structure and broad conferral of administrative authority upon the Special Master "also support[ed] the view that her payment-calculation decisions f[e]ll within the scope of the statute's judicial-review bar." *Id.* (observing that the Special Master was responsible for evaluating "eligibility criteria, allocation methodology, and timelines specifically articulated by the statute," in addition to "broader non-claim-specific decisions, such as considering available funds, establishing payment procedures, and detailing a payment methodology for each distribution"). The court further explained that "[t]he placement of the [jurisdiction-stripping] provision"—titled "'Decisions of the Special Master'"—"in the larger subsection entitled 'Administration of the [USVSSTF]'" gave the provision its broadest possible reach. *Id.* at *5 (quoting 34 U.S.C. § 20144(b)). All of this led the court to conclude that the Special Master's "payment and eligibility determinations—as well as all decisions regarding the methodology for calculating payments . . . —are withheld from judicial review." *Id.*

For the same reasons, this court concludes that it lacks subject-matter jurisdiction over Plaintiffs' claims. The Special Master's various decisions regarding a claimant's classification, judgment values, and timeliness are plainly "decisions . . . with regard to compensation from the Fund." 34 U.S.C. § 20144(b)(3). Start with the Net-Zero Plaintiffs' chief complaint: that the Special Master incorrectly categorized them as 9/11 family members rather than as 9/11 victims.

ECF No. 1 ¶¶ 25, 169.  This categorization plays an integral role in the Special Master's compensation decisions because, as Plaintiffs admit, it "caps . . . [a claimant's] net eligible claim amount." *Id.* ¶ 172.  It also affects the calculation of any catch-up payments.  *See id.* ¶ 173 ("Had Defendants appropriately categorized the Net-Zero Plaintiffs, . . . the Net-Zero Plaintiffs would each have received a lump sum catch up payment . . . without a pro-rata reduction of their claim amount[.]").  Requiring the Special Master to revisit those classifications would force her to reevaluate the compensation amounts awarded to all claimants, thus placing the decision squarely within the ambit of the jurisdiction-stripping provision.

With respect to the remaining Plaintiffs, the Special Master is also tasked with determining whether a claimant has met the statute's deadlines.  *See* 34 U.S.C. § 20144(c)(1)(C) & (c)(3).  These deadlines—which affect the claims of the Supplemental-Value, Nunc-Pro-Tunc, and Dual-Judgment Plaintiffs—dictate eligibility, which in turn dictates compensation.  *See id.* § 20144(d)(1) (explaining that the Special Master "shall order payment from the Fund for each eligible claim"); *id.* § 20144(c)(1) (explaining that "a claim is eligible if the Special Master determines that" it complies with the statute's deadlines).  A court therefore cannot second-guess the Special Master's decision regarding a deadline without undermining her "decision[] . . . with regard to compensation from the Fund." *Id.* § 20144(b)(3).  And, as Plaintiffs' complaint makes clear, these two are intrinsically linked.  *See* ECF No. 1 ¶ 192 ("Defendants deprived the Supplemental-Value Plaintiffs of substantial compensation in the form of lump sum catch-up payments[.]"); *id.* ¶ 208 ("By virtue of the USVSST[F]'s arbitrary and capricious acts[,] the Nunc Pro Tunc Plaintiffs . . . [were] deprived of payments in the third round that provided compensation of 0.7567585% of each eligible claimant's net eligible value.").

Plaintiffs have little to say in response to *O'Neill*, which they refer to only once in their opposition brief.  *See* ECF No. 23, at 10.  Rather than addressing *O'Neill*, Plaintiffs contend that the Section 20144(b)(3)(B)'s jurisdiction-stripping provision plausibly "differentiate[s] between threshold claimant classification determinations and subsequent decisions as to the amounts of 'compensation' that claimants are due." *Id.* at 9.  But this "narrow reading of the word 'decisions'" pays short shrift to "the larger statutory structure and scope of the Special Master's authorities with regard to ordering compensation."  *O'Neill*, 2022 WL 17415057, at *5.  Carving out "every decision of the Special Master regarding compensation . . . that does not *directly* result in an individual adjudication of a particular claim" would "significantly undermine[]" Congress's judicial-review bar. *Id.* (emphasis added).  And it oversimplifies the meticulous administration of the USVSSTF's complex payment scheme.  Deciding whether an individual fits into a particular class of claimants or has properly and timely submitted an application is part of the compensation process. *Id.* at *4 ("[The Special Master] determines, for example, whether an individual is statutorily eligible, which of his claims qualify for recovery, whether he has provided adequate supporting documentation, and how much he is qualified to receive in each distribution round.").  As such, those determinations are not judicially reviewable.

In arguing otherwise, Plaintiffs rely on *Braun v. United States*, 531 F. Supp. 3d 130 (D.D.C. 2021).  In their view, *Braun* stands for the proposition that Section 20144(b)(3)(A)'s "use of 'each claimant' may serve to bar review of individual determinations while still allowing courts to consider programmatic challenges to the Fund's operation."  ECF No. 23, at 10 (quoting *Braun*, 531 F. Supp. 3d at 136).  The trouble for Plaintiffs is that the *O'Neill* court considered—and rejected—this argument.  The *O'Neill* court recognized that the *Braun* court had "reserved judgment on the question of whether a statutory challenge about [the] retroactivity of the

Clarification Act as a whole would be reviewable." *O'Neill*, 2022 WL 17415057, at *5. But Chief Judge Boasberg, who decided both cases, concluded that the *O'Neill* plaintiffs "read too much into *Braun*, which itself expressed skepticism that 'objections to distributions' would be reviewable and never decided the full scope of 'decisions' that were withheld from judicial review." *Id.* at *5 (quoting *Braun*, 531 F. Supp. 3d at 136). Instead, he firmly held that the plaintiffs could not "evade the bar on judicial review merely by bringing their claims together and characterizing their challenge as programmatic." *Id.* at *6. Thus, any reviewability questions left open in *Braun* were definitively closed in *O'Neill*. *See id.* at *3, *5.

Here, individual and so-called "programmatic" challenges are two sides of the same coin. Neither challenge is reviewable. The statute's immunization of "[*a*]*ll*" decisions regarding compensation does not differentiate between individual claims and program-wide ones. 34 U.S.C. § 20144(b)(3) (emphasis added). And because the USVSSTF is a single pool of funds, the Special Master's decisions with respect to one claimant or group of claimants necessarily affects thousands of others. *See id.* § 20144(d)(3)(A)(i) (requiring the Special Master to make payments on a "[p]ro rata basis" among all eligible claimants). In such a scheme, attempting to slice off "threshold . . . determinations" from the interwoven compensation process does not work. *See* ECF No. 23, at 9.

Plaintiffs next rely on *American Clinical Laboratory Ass'n v. Azar*, 931 F.3d 1195 (D.C. Cir. 2019), but that also fails. There, the D.C. Circuit considered the reach of a jurisdiction-stripping provision in the Protecting Access to Medicare Act, Pub. L. No. 113-93, 128 Stat. 1040 (2014) (codified at 42 U.S.C. § 1395m-1(h)(1)). A primary goal of the Act was "to set Medicare reimbursement rates for laboratory tests at approximately the price private insurers pa[id] for the same tests." *Am. Clinical*, 931 F.3d at 1199. To achieve that objective, the Act authorized the

Secretary of Health and Human Services to collect data on laboratory-test prices and subsequently determine the appropriate Medicare "payment amounts" for those tests. *See* 42 U.S.C. § 1395m-1(a) & (b). After the Secretary proposed a series of rules to guide data collection, a trade association of laboratories sued to block them from taking effect. *Am. Clinical*, 931 F.3d at 1202. In response, the Secretary argued that the court lacked subject-matter jurisdiction to entertain the suit under the Act's jurisdiction-stripping provision, which prohibits any "administrative or judicial review under section 1395ff of [the Act], section 1395oo of [the Act], or otherwise, of the establishment of payment amounts under this section." 42 U.S.C. § 1395m-1(h)(1).

The D.C. Circuit sided with the trade association and drew a distinction between "the amounts of money paid in the ultimate reimbursement decisions"—which were not reviewable—and the "data collection practices that precede and inform the setting of those amounts"—which were. *Am. Clinical*, 931 F.3d at 1205. After analyzing the statute's plain text and comparing it to other preclusion schemes, the Court concluded that the two types of decisions were not "inextricably intertwined" and could be treated separately. *Id.* at 1206 (quoting *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 521 (D.C. Cir. 2016)).

At first blush, *American Clinical* appears to support Plaintiffs' position. But the comparison collapses upon closer inspection for three primary reasons. First, the specific language of the jurisdiction-stripping provision in *American Clinical* constrains its reach. Section 1395m-1(h)(1) expressly bars review "under section 1395ff of this title, section 1395oo of this title, or otherwise." Sections 1395ff and 1395oo both "cover administrative appeals by patients or providers who wish to contest a coverage determination or reimbursement amount." *Am. Clinical*, 931 F.3d at 1205. In other words, the provision's deliberate cross-references

"suggest[] that Congress intended to preclude review of the amounts of money paid in the ultimate reimbursement decisions," rather than any other component of the statutory scheme. *Id.*

In contrast, the jurisdiction-stripping provision in the USVSSTF Act contains no narrowing language or cross-references. Instead, it speaks both plainly and broadly: "[*a*]*ll* decisions made by the Special Master *with regard to compensation*" are "not subject to administrative or judicial review." 34 U.S.C. § 20144(b)(3) (emphases added). That includes decisions like "considering available funds, establishing payment procedures, and detailing a payment methodology for each distribution," all of which fit "[w]ithin [the Special Master's] obligation to 'order payment from the Fund for each eligible claim.'" *O'Neill*, 2022 WL 17415057, at *4 (quoting 34 U.S.C. § 20144(d)(1)). No part of Section 20144(b)(3) restricts its scope to dollar amounts or individual steps within the compensation-calculating process. Furthermore, Congress placed the provision under a subsection titled "Administration of the Fund," thus giving it a broader, not narrower, scope. 34 U.S.C. § 20144(b)(1). Congress did not, for example, situate the provision under subsection (c) (titled "Eligible claims") or subsection (d) (titled "Payments"). If the provision were only meant to immunize narrow, discrete acts like Plaintiffs suggest, *see* ECF No. 23, at 9, its placement in an expansive subsection makes little sense.

Second, the entirety of Section 1395m-1 indicates that the act of collecting data is not a component of "establish[ing] . . . payment amounts," 42 U.S.C. § 1395m-1(h)(1), but rather "a separate statutory duty preceding the establishment of Medicare payment rates," *Am. Clinical*, 931 F.3d at 1205. The D.C. Circuit contrasted this bifurcated scheme with a scenario in which "the challenged action [is] encompassed within the terms of unreviewable action." *Id.* at 1206. As an example of the latter, the Court pointed to *Texas Alliance for Home Care Services v. Sebelius*, 681 F.3d 402 (D.C. Cir. 2012), where it had held that the statutory bar on reviewing "'the awarding of

contracts,'" likewise precluded judicial review of any financial standards that were a "'[c]ondition[] for awarding contract[s].'" *Am. Clinical*, 931 F.3d at 1205-06 (alterations in original) (first quoting *Tex. All. for Home Care Servs.*, 681 F.3d at 409-10; then quoting 42 U.S.C. § 1395w-3(b)).

This case is more like *Texas Alliance* than *American Clinical*. Determining which category a claimant belongs to and assessing whether a claim is timely are both necessary "conditions" to awarding compensation from the USVSSTF. *See* 34 U.S.C. § 20144(d)(1) (explaining that the Special Master "shall order payment from the Fund for each eligible claim"); *id.* § 20144(c)(1) (explaining that "a claim is eligible if the Special Master determines that" it complies with the statute's deadlines). If the Special Master concludes that a claimant does not fall within a class of individuals entitled to receive certain payments or that he missed the application deadline, that is a decision that directly affects compensation.

Third, the D.C. Circuit in *American Clinical* stressed Section 1395m-1's requirement "that the parameters for . . . data collection be established through notice and comment rulemaking." 931 F.3d at 1206. Because the notice-and-comment process exists "to ensure [that] the parties develop a record *for judicial review*," the specific requirement for data-collection procedures strongly suggests that such procedures are meant to be judicially reviewable. *Id.* (emphasis added); *see Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) ("Notice requirements are designed . . . to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."). The Court reiterated this point again and again, citing three other cases where the *absence* of notice-and-comment rulemaking indicated Congressional intent to preclude judicial review. *Am. Clinical*, 931 F.3d at 1206-07 (citing *Tex. All. for Home*

*Care Servs.*, 681 F.3d at 402, *Mercy Hosp., Inc.*, 891 F.3d at 1062, and *Fla. Health Scis. Ctr., Inc.*, 830 F.3d at 515).  In contrast to *American Clinical*, the USVSSTF Act lacks any notice-and-comment procedures with respect to claimant classification, timeliness, or the basic tasks of administering the Fund.  *See generally* 34 U.S.C. § 20144.[7]

As the *O'Neill* court convincingly explains, and as Plaintiffs fail to meaningfully counter, the plain text of the USVSSTF Act's jurisdiction-stripping provision applies to all "payment and eligibility determinations" by the Special Master.  2022 WL 17415057, at *5.  Because classifying claimants into separate groups and determining application timeliness are "decisions . . . with regard to compensation," 34 U.S.C. § 20144(b)(3), the court lacks jurisdiction to review them.

### B.    Plaintiffs' Requested Relief

While the plain language of the USVSSTF Act settles the jurisdictional question, the nature of Plaintiffs' prayers for relief provides additional evidence that their claims are not reviewable.  *See Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (indicating that a court should look beyond a plaintiff's own characterization of his complaint when resolving questions of preclusion); *O'Neill*, 2022 WL 17415057, at *5 (same).  Peeking behind the curtain reveals that, "at bottom[,] this case concerns [the Special Master's] compensation decisions for 9/11-related claimants."  *O'Neill*, 2022 WL 17415057, at *5.

While Plaintiffs try to characterize their claims as only seeking a declaration that Defendants acted unlawfully and an order compelling Defendants to "correctly categorize them," ECF No. 23, at 10, the transparent goal of such relief is to alter the amount of their compensation.

---

[7] The only notice-and-comment requirements in the statute apply to the Comptroller General's Report.  34 U.S.C. § 20144(d)(4)(C)(ii) & (d)(4)(D)(ii).

This "end result . . . is the same as if a single 9/11 claimant had raised this issue with respect to her particular claim: to draw more money from the Fund." *O'Neill*, 2022 WL 17415057, at *6. That is presumably why Plaintiffs ask for this court to make the effect of its judgment "retroactive" to when the Special Master started the compensation decisional chain. *See* ECF No. 1 ¶ 240 (asking that Plaintiffs' preferred categorization be retroactive to May 19, 2020). The Supplemental-Value, Nunc-Pro-Tunc, and Dual-Judgment Plaintiffs' requests for relief make this even more apparent. Each of these groups expressly ask for their USVSSTF claims to be declared timely so that their catch-up payments can be recalculated. *See id.* ¶¶ 244, 249, 253 (requests for relief); *id.* ¶¶ 192, 213, 232 (explaining that a favorable ruling on timeliness would provide Plaintiffs with "substantial compensation" and "payments").

In sum, each of the determinations challenged by Plaintiffs is inextricably linked to the amount of compensation they are entitled to receive from the USVSSTF. "[L]ook[ing] beyond Plaintiffs' characterization of their challenge[s] and view[ing] [them] through the perspective of the relief sought" reveals that—at their core—Plaintiffs' claims seek to change the amount of their distributions from the Fund. *O'Neill*, 2022 WL 17415057, at *5. Properly contextualized, such claims are not subject to judicial review.

## C.    Policy and Purpose

As a final consideration, the purpose of the USVSSTF and attendant policy considerations weigh against judicial review here. As a practical matter, because every compensation and distribution decision by the Special Master must be made on a pro rata basis across multiple subgroups of 9/11-related and non-9/11-related claimants, *see* 34 U.S.C. § 20144(d)(3), retroactive modification of payment amounts would create an administrative quagmire. Once a round of

distributions has been finalized and paid, "judicial review cannot unscramble the egg." ECF No. 18-1, at 18.

More importantly, exposing the Special Master's countless administrative decisions to judicial scrutiny would gum up the compensation process for a program that is designed to expeditiously distribute funds to victims of state-sponsored terrorism. "Congress's manifest intent was that the Fund . . . compensate [claimants] efficiently and quickly." *O'Neill*, 2022 WL 17415057, at *6. That is why Congress "exempted the Fund's procedural rules from lengthy notice-and-comment rulemaking," *id.*, and instructed the Special Master to authorize the first round of payments from the USVSSTF within a year of its creation, *see* Pub. L. No. 114-113, § 404(d)(2), 129 Stat. at 3010. "Inserting judicial review into the wide-ranging and technical decisions of the Special Master regarding the calculation of payments 'would severely disrupt [the Fund's] complex and delicate administrative scheme' for expeditiously allocating payments to claimants, potentially creating unreasonable delays and litigation in conjunction with every distribution round." *O'Neill*, 2022 WL 17415057, at *6 (quoting *Block*, 467 U.S. at 348); *Nat'l Lab. Rels. Bd. v. United Food & Com. Workers Union, Local 23*, 484 U.S. 112, 131-32 (1987) (explaining that it would be "illogical in the extreme" to permit judicial review "where Congress was convinced that speed of resolution is most necessary").

## V.    CONCLUSION

For the foregoing reasons, the court will grant Defendants' Motion to Dismiss, ECF No. 18.

A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:    September 18, 2025